Judge Bauer became ill this morning, nothing serious, but he's not going to be sitting on the bench, but he is going to listen to the tape recording of the arguments today, so he'll be participating in the final decision of the panel, but he won't be here today. Mr. Merritt, Mr. Merritt, come on and tell me your name before I screw it up. Rosemarion, is that right? Rosemarion, may it please the Court, my name is Kerri S. Rosemarion, with Mr. Peterson to my left. I represent appellants William and Nancy Liebhart. Liebhart's appeal the District Court's grant of summary judgment to defendants, as well as the District Court's exclusions of their expert witnesses Woodyard and Carpenter. They also appealed the District Court's denial of summary judgment to the Liebharts, as well as their motions to amend the complaint and to supplement Dr. Carpenter's expert opinion. The Liebharts seek a reversal and general remand to the District Court. There are four components to our argument today. The first is the RCRA citizen suit. RCRA is the Resource Conservation and Recovery Act. Second is the TSCA citizen suit. TSCA is the Toxic Substances Control Act. The third is the District Court's denial of injunctive relief to the Liebharts, and the fourth is the denial by the District Court of their complaint. This case epitomizes the very reason that Congress empowered citizens to act as attorneys general when governments have not acted. It is obviously an environmental case, but it is more than that. This case deals with polychlorinated biphenyls, PCBs. PCBs are among the most toxic substances known to humankind. SPXs, when I refer to SPX, I'm referring collectively to all three defendants. SPX's reckless demolition has had a profound effect on the Liebharts' lives. They've sought medical attention for exposure to the dust from the demolition. They've had to move out of their house on the recommendation of their physician because of the PCBs resting on the surface of their residential backyard. I draw the court's attention to figure two on page 11 of her opening brief. It shows the proximity of the demolition site to the Liebharts' home. It also shows the generation of dust, and in fact, that photograph was taken on February 25th, 2015, by defendant Apollo. It was taken the very day that William Liebhart complained to the Watertown Health Department about the dust from the demolition. First issue, RCRA. Plaintiffs need only show that the demolition may present an environmental standard. Courts are in universal agreement that the may present standard is to be liberally construed to achieve Congress' purpose to protect health and the environment. Now, applied here, the Liebharts need only show by preponderance of the evidence that PCB dust from the demolition site on this side of the fence got onto the surface of their property on the other side of the fence. The district court has helped us out in this inquiry because the district court stated, quote, no one has suggested that the PCBs came from a source other than the SPX site. Therefore, the choices are that the dust on surface of Liebharts' home came from the demolition or, as SPX argues, came from some unidentified historic event in the past or some combination of the two. There's undisputed evidence, overwhelming evidence, that the dust came from the demolition. The dust contained PCBs. PCBs were not removed before the demolition. The demolition even did dust. The dust blew onto the residences. There's eyewitness testimony of that. William Liebhart had to remove the dust from his car in the morning by his wipers during the demolition in order to back out of his driveway. There are photos by Apollo. There's Nancy Liebhart's video, which I commend to the court's viewing, which shows the actual demolition dust coming onto the Liebharts' property. Mr. Rosemarie, do we take from your argument now that you don't believe your expert testified to the requisite level of particularity, that we should rely on, we can rely on the record as it stands, or the opposite? Your Honor, we maintain, the Liebharts maintain, that in fact the evidence that by lay jurors can clearly show by preponderance of the evidence that the dust from the demolition settled on the Liebharts' property. In fact, no expert testimony is needed. And indeed, SPX has argued otherwise, but has not identified a single piece of evidence that cannot be understood by lay jurors. Nonetheless, Your Honor, in fact, we have, Liebharts have put forth Mr. Woodyard as an expert witness, and his qualifications have been unimpeached. And he has stated clearly his conclusion based on his analysis of the data and analysis of the Stolzenberg on the surface of the Liebharts' property. And I'm zeroing in on pages 8 and 9 of the Woodyard report, which Judge Peterson indicates was insufficient for purposes of reaching his causation, concluding causation. Are you arguing that no expert Woodyard's opinion was sufficient, or are you arguing it doesn't matter, the lay opinion can? Yes, I'm arguing both actually, Your Honor. Okay. I'm actually arguing that, in fact, Woodyard's testimony and report were clearly sufficient. And I'm also arguing that, in fact, no expert testimony is actually necessary to prove by preponderance of the evidence that the PCB-laden dust came to rest on the surface of the Liebharts' property. That is shown, actually, Your Honor, by tables 1 and 2, which were produced by SPX and appear in pages 17 to 18 of the Liebharts' opening brief. The data from the surface of the Liebharts' property, all of the samples taken from the Liebharts' property show PCBs. And not only that, they show PCBs in concentrations exceeding the level that the Wisconsin Department of Natural Resources has set as protective of health and the environment. Additionally, I mentioned the Stolzenberg family previously. The other piece of evidence that is clearly understood is the analysis by TRC's Dr. Stolzenberg. Dr. Stolzenberg compared the PCBs chromatograms. That's just essentially the chemical fingerprints of the PCBs on the SPX side of the fence. And he compared the chromatograms on the Liebharts' side of the fence. He found that the source of them were the same. And in fact, including the surface sample, his analysis included the surface sample of the Liebharts' vegetable garden. The surface of the soil in the Liebharts' vegetable garden, which was 25 times the DNR acceptable level. The district court erred because it ignored the surface data and it excluded the Stolzenberg analysis. And as I said previously, all of this evidence is plainly understood, can be plainly understood by lay jurors. The district court erred with respect to experts, all three experts, in the same manner. And that is, it failed to consider an With respect to Dr. Keenan, who's SPX's expert, Dr. Keenan did not even acknowledge the existence of the Stolzenberg memo. What's more, defendants, SPX, did not respond at all to the four bases that the Liebharts put forth as the, for the Keenan report being utterly invalid. Why was there, why wasn't there a motion to exclude Mr. Keenan or to limit his testimony? Your Honor, we made the strategic decision to cross-examine Dr. Keenan during trial. We never got that opportunity. And additionally, well, that is the basic reason, Your Honor. Because you made the determination that you would prefer to hear his opinions fresh or challenge him before the finder of fact doesn't preclude you from limiting, moving to limit his testimony. No, it did not, Your Honor. But again, we just made the strategic decision to reserve that issue for the court, you know, so that the trial judge could observe the Dr. Keenan's testimony. And with respect to the state claims, that the jury would be able to hear Dr. Keenan's testimony and cross-examination. Additionally, as to Woodyard and Carpenter, the district court failed to consider an essential factor as to both. And instead, as to both, it focused on a collateral factor. With respect to Mr. Woodyard, it failed to consider Mr. Woodyard's analysis of the surface data. And instead, focused on his testimony about PCBs appearing in the deeper samples. The critical factor here is that Mr. Woodyard gave perfectly rational explanations for the appearance of PCBs in the deeper data that did not conflict at all and were entirely consistent with his conclusion that the PCBs on the surface of the Leap Heart property came from the demolition. No conflict at all. Additionally, similarly, I should say, with respect to Dr. Carpenter, the district court, again, focused on a collateral issue and disregarded a key factor. The district court said that Dr. Carpenter said there is no safe level of PCBs and on that sole basis, it excluded him. The court conducted no dobert analysis whatsoever. The court's decision to exclude Dr. Carpenter on that one basis that he stated that there is no safe level is in direct contravention of this court's decision and Schultz, the Axo Nobel paints. Moving on to the Tosca citizen suit. The grovelman of the Leap Hearts have asserted them are the continuing violation of disposal regulations, particularly 40 CFR 125A and 40 CFR section 61.65. The key point is that the United States Environmental Protection Agency interprets its own continues until it is cleaned up. Now, there's no dispute that no PCBs have been cleaned up here, nor is there any dispute by defendants, by SPX, that that is the correct interpretation of a violation of unlawful disposal and therefore, unlawful disposal continues. Indeed, in the district court's opinion, denying the motion, the SPX's motion to dismiss, that is exactly what the district court said, that disposal continues until it is cleaned up. Therefore, there is unlawful disposal and there is a continuing violation and the court's decision otherwise is reversible error. Issue number three, the what would be done with injunctive relief that's not already being done by the Wisconsin DNR? A key point, your honor. There is no contamination that is beyond the area that SPX proposes to clean up. The key point here is that the DNR approved plan ignores federal PCB regulations, which are unique. They are not replicated in Wisconsin law and the key point is that there is no provision in the plan for further exploration, further investigation of where the contamination stops. The proposal for the DNR plan is in figure five of our opening brief and it shows three areas, three limited areas that are proposed to clean up and SPX proposes to clean that up and then call it a day and allow that. They require further explanation to determine where the contamination stops and as I said, here there is known contamination beyond the boundaries of the cleanup area. It is after, even if the contamination is cleaned up in accordance with the SPX plan, the imminent and substantial endangerment will remain. Do I understand you to say there is contamination beyond? Yes, there is. Yes, Judge Connolly. There is contamination on the north, for example, on 1113 South 3rd Street as well as 1111 South 3rd Street. Those samples were removed from the diagrams that appeared in figure five, but I think that in our opening briefs we cited to the exact place where the contamination, that contamination is shown. The results of the district court's error on this point are quite great because they, the essentially gives SPX a pass on compliance with federal law. Additionally, it embodies the utterly abhorrent recommendation by TRC's David McNichol, who is the project manager, to cover up the contamination. David McNichol, upon seeing high levels of PCBs on the surface of the area, said, stop characterizing. In other words, stop investigating because you're shooting SPX in the foot, quote unquote, even though he knew children lived at 1129. That's what this plan does. And for that reason, the district court's opinion should be reversed. Final issue, the amendment of the complaint is the burial of PCB contaminated concrete on the demolition site itself. That was in violation of the EPA's approved plan that SPX submitted and in violation of federal law. That is undisputed. It is also undisputed that SPX gave false responses to the Liebhardt's interrogatories on this very point. On that point, I'd like to accelerate you to this issue of the statutory notice. And at the additional appendix, pages 157, starting at page 157, is your letter from April 6th, giving the notice of intent to sue. What is your response to the argument that that doesn't include the burial on the site itself of the concrete? My response, your honor, is the quote from my letter itself. My letter stated the PCB plan, that is the plan that SPX submitted for EPA approval, quote, the PCB plan stated that SPX would remediate PCBs to 0.74 ppm. Now, they said, SPX said, we're going to remove all contaminants over 0.74 ppm. Yet, they buried all PCBs up to 50 parts per million. And your quote is from the bottom paragraph on page two of your April 6th, 2016. I believe so, your honor. I neglected to put that in my notes. Where were they burying it? They buried it right on the demolition site. There were various voids in the basements. The structure was full of PCBs. They leveled the walls, but there were some voids, and the PCB wastes were buried in the voids on the site. Do we know, just to go backwards, why was there PCB in the concrete to begin with? The site was originally used in the 1950s through the 1970s to manufacture transformers. That was prior to the time that PCBs were banned. PCBs in those years were used extensively in transformers and capacitors and various other... So the concrete itself wasn't necessarily contaminated initially. It was after... By virtue of use of the facility for its intended purpose. Yes, your honor. And it was all over the floor. In conclusion, the demolition clearly caused the imminent and substantial endangerments on the residents and on the SPX site. SPX should be enjoined to remove them. SPX remains in violation of the federal PCB regulations and should be enjoined to comply with federal law. The DNR plan merely approves... Allows SPX to evade federal law. And SPX should be enjoined to comply with it, as I stated. Because even if it is implemented, the SPX plan will allow imminent substantial endangerments to remain. And finally, the Leap Heart should be allowed to amend their complaint. It was not futile because it gave ample notice to SPX of what it was doing wrong. Thank you very much. Thank you, counsel. May it please the court. I'm Matthew Splittick, counsel for SPX Corporation, giving argument on behalf of all the appellees this morning. I wanna focus this morning on the dismissal of the Leap Heart's RCRA and TASCA claims. There are multiple independent reasons why that dismissal should be affirmed. I think three are most straightforward. First, the district court appropriately exercised its discretion in excluding the Leap Heart's expert causation opinion. And without that opinion, neither the RCRA nor the TASCA claim could survive. Second, specifically with respect to the TASCA claim, the kind of mandatory injunctive relief that the Leap Heart's were seeking simply is not available as a matter of law. And third, the district court also appropriately exercised its discretion in concluding that even assuming the Leap Heart's had supported any claims under RCRA or TASCA, injunctive relief would not be appropriate here when defendants are already endeavoring to clean up the property under the supervision of the Wisconsin Department of Natural Resources. I wanna start by talking about the district court's exclusion of Wood Yard. The Leap Heart's agree this decision is reviewed for abuse of discretion. That's at page six of their reply brief. The district court gave multiple reasons and undertook a detailed analysis in exercising that discretion. It attended first to Wood Yard's equivocations, and the Leap Heart's are wrong in arguing that the district court failed to distinguish between the surface soil data and the deeper soil data when it was addressing that issue. I do wanna make sure that it's clear what is meant by the term surface soil data, and this is addressed in our brief at page 23 footnote nine, but in short, we're talking about the first six inches of soil below the vegetation root zone. We're still talking about soil that we would consider to be underground. These aren't samples taken from the surface of the ground that people are walking on. Wood Yard made a couple very relevant admissions in his deposition testimony. One was that he did not have enough information to determine whether the contamination at eight inches or lower in the deeper soil came from demolition dust or not. And the district court noted that admission, and when it did so, it noted explicitly the link to Wood Yard's testimony about the deeper soil data. Demolition dust as opposed to what? As opposed to, well, there are a couple of different alternative explanations. One is, as Mr. Rosemarin said, that there was some other historical transport from the SPX site, but also defendants contend that the Leap Heart's imported soil from elsewhere into their property that can explain the contamination. And in addition to that, at docket 119 pages 15 and 16, one of the expert witnesses retained in this case discovered public records showing that the Leap Heart's property formerly was used to store and to sell used amusement park equipment. So I think there are multiple possible explanations for where the contamination in the Leap Heart soil came from. Wood Yard expressly admitted that as to the deeper soil contamination, he did not have enough information to rule out the possibility that the contamination was historical and predated the demolition. Was Mr. Wood Yard cross-examined his deposition concerning the prior use of the Leap Heart property? Mr. Wood Yard was examined about his investigation into the prior use of the Leap Heart property, and what Mr. Wood Yard testified was that he made no attempt to investigate the property's history. And this record citation you've given with regard to the prior use of the Leap Heart property, how does that come in? How does that come into the record? Is it produced as part of a document production? That is part of an expert report, Your Honor. In whose report is that? It is a report of Margaret Carrillo Sheridan. And how do you spell that last name? Carrillo, I believe it's C-A-R-I-L-L-O hyphen Sheridan. And this is a defense expert? Yes, this is a defense expert. Thank you. So in addition to admitting that he didn't have enough information to rule out historical contamination at the deeper soil level, Mr. Wood Yard also admitted that regardless of depth, he just made no effort to rule out alternative explanations for the contamination in the soil. And the Leap Heart's position on this, I think, is that there just weren't any alternative explanations for Mr. Wood Yard to rule out at all. That the only possible explanation for the contamination, at least at the surface soil level, the six inches below the vegetation root zone, that the only possible explanation is the and that's just not consistent with the record. And to go briefly through some of the evidence, the highest concentrations of PCBs were found in the deeper soil, not the shallower soil. The Leap Heart's surface soil had higher concentrations of PCBs than the surface soil on the SBX side of the fence where the demolition occurred. The Leap Heart's surface soil had PCBs even beneath an area covered by solid asphalt. Mr. Leap Heart testified that he excavated and redistributed soil around the yard on multiple occasions. In fact, to the same areas where it turned out the highest concentrations of PCBs were found. There was evidence of fill material overlaying native material throughout the property, of soil being imported into the property. The Leap Heart's had their blood tested when they were worried about PCB exposure, and unfortunately they both tested negative for PCBs. They had a consultant come in and test the surfaces of their home for PCBs, and those tested negative too. The Leap Heart's reply brief argues that that was just because Nancy Leap Heart had been dusting, but what she actually testified, it's at pages 92 through 94 of her deposition, is that dust had been accumulating on some parts of the house ever since the demolition had begun. So all told, there was absolutely more than one possible explanation for the PCBs found in the Leap Heart's soil, including the surface soil. And Woodyard's opinion was not reliable, where he had done nothing to rule out any explanation aside from the one in the Leap Heart's complaint, where he hadn't done anything to investigate the property's history, hadn't even interviewed the Leap Heart's before providing his report. The reply brief cites the Schultz v. Axel Noble case, but at page 434 of that case, the court can see the expert in Schultz thoroughly addressed the possibility of alternative causes. Woodyard didn't do that here. The Leap Heart's reply also argues that maybe defendants aren't responsible for the deeper contamination, but it's enough to rule out alternative possible causes for the surface soil contamination, but the problem with that is Woodyard didn't do that either. He didn't rule out alternative explanations for any of the contamination. Mr. Splietek, this is where obviously our function comes in, because we're reviewing Judge Peterson's determination, not by weighing the evidence itself, and neither should Judge Peterson be weighing the evidence himself. Rather, it's this determination under the Daubert analysis, and if we end up getting an agreement or a conclusion that the correct analysis was applied, we still have to look at what he said or did. Where are we bleeding over from making that determination of a correct Daubert analysis to actually weighing the evidence? That's a good question, and I just went through a lot of factual information, and I'm not saying that the court should conclude that the explanation given by defendants is the only possible correct explanation, or that it should look at the plaintiff's case and our case and figure out which evidence the court finds more persuasive, and that's not what Judge Peterson did either. What Judge Peterson did was acknowledge the fact that there is evidence on both sides. There are multiple possible explanations, and Woodyard did not come in and try to apply any methodology to rule out our evidence that weighs in favor of that. So it's Woodyard's failure to undertake the analysis that I think is important and that Judge Peterson was focused on. Judge Peterson wasn't making a ruling that he looked at all the evidence and he decided that one side's evidence was more persuasive than the other. And I assume your argument is not just that Woodyard didn't address your expert's analysis, but you found expert Woodyard's analysis deficient in terms of the translation from PCBs onto the Leibart property. That's exactly right. Woodyard made the same mistake that I think that the Leibarts are making, which is assuming that any contamination, at least in the surface soil, must have come from the demolition, and stopping there, not undertaking any further analysis. Now given the exclusion of Woodyard's causation opinion, the Leibarts had no expert evidence that defendants disposed any amount of PCBs on their property, and that's fatal to both their RCRA and their task of claims. The Leibarts are arguing they don't need expert evidence, but that's not right because the transport of PCBs in dust is just not a matter, a subject for lay opinion. This was a large facility, only some areas of the concrete flooring had tested at high levels of PCBs, which incidentally defendants were focused on cutting out and removing early in the process. Dust may be visible to the naked eye, but PCBs are not. The question how much, if any, contamination found in soil can be attributed to airborne dust in 2015 is not a subject for lay opinion. Expert testimony is needed to interpret and opine upon the evidence that's available. The Leibarts didn't submit that opinion in admissible form, and below, as the district court noted, they did not. Turning specifically to the task of claim, as I said at the outset, there's a completely separate reason that the task of claim fails, and that is that the task of citizen supervision does not authorize mandatory injunctive relief against private parties. Leibarts addressed this issue a bit at their reply, but they never account for the statutory text and the case law showing that mandatory injunctive relief is not available under their task of citizen suit claim. The statutory text is right in the citizen supervision itself, it's 2619, 15 U.S.C. 2619. There's two paragraphs in there that are very relevant. A1 is the provision for citizen suits against private parties, and that tells us that those suits, which is what this suit is, must seek to restrain the task of violation. But the very next paragraph, A2, is about citizen suits against the EPA, and that provision authorizes those suits to seek to compel the EPA to perform discretionary duties under TASCA. Leibarts can't explain why the statute would read like that if Congress had intended to make mandatory injunctive relief available in both kinds of citizen suits addressed in these neighboring paragraphs in the same statute. And then there's the case law I mentioned. We cite four cases at page 47 of our brief explaining that, in fact, mandatory injunctive relief is not available in TASCA citizen suits against private parties. One of those cases is Brewer v. Ravon. It's from the Middle District of Tennessee. That case, just like this one, involved alleged violations of TASCA's PCB disposal regulations. Mandatory injunctive relief was not available. The Leibarts don't address those cases at all in their reply, nor do they cite any case where any court did order mandatory injunctive relief in a TASCA citizen suit case against a private party. The cases they do cite are Newell Recycling Company and INRI Standard Scrap Metal. Those weren't TASCA citizen suit cases. Those cases were about the EPA's authority. And the EPA can seek mandatory injunctive relief that private parties cannot. That issue is also addressed in the Brewer v. Ravon case from Tennessee. I'd like to turn now to the district court's ruling that even assuming a RCRA or TASCA violation, injunctive relief would not be appropriate. What's your response to Mr. Rosemarine's argument about the scope of the problem being broader than the state? Mr. Rosemarine is talking about evidence of contamination below Wisconsin's residential cleanup standard. The Wisconsin DNR is requiring defendants to clean up the Leibarts' property below the state cleanup standard, which is more stringent than the federal cleanup standard. They're not requiring, and no agency, federal or state, would require defendants to clean up every particle of PCBs that could possibly be identified in the property. And so evidence of contamination that doesn't even meet the very low threshold that the DNR is requiring defendants to clean up to is not evidence that a substantial and imminent endangerment, if one even exists now, would persist after the cleanup. I think the Leibarts don't contest what in my mind are the other key points relating to this issue, which is that they would need to prove irreparable harm to win any injunctive relief, that they are specifically seeking mandatory injunctive relief, not a prohibitory injunction, that mandatory injunctions are issued rarely and only upon the clearest equitable grounds, that while mandatory injunctions can be issued in RCRA citizen suitcases, unlike in TASCA suits, they must be limited to compelling necessary acts under the statute's text, and that, as I've already said, the DNR plan requires defendants to clean up the Leibarts' soil to a level that is more stringent than federal law would even require, and finally, that great deference generally is owed to the district court's decision not to grant injunctive relief. And that decision should be deferred to here. There is no irreparable harm. There's no need for the district court to take the extraordinary step of taking over a cleanup that was approved by the EPA itself. The DNR required defendants to obtain that approval in the course of giving its approval, and it's been given. There's no evidence that the DNR approved plan will fail to accomplish its end, which is an appropriate remediation of the Leibarts' property, regardless of where the I have a little time left. I'd like to address an argument in the Leibarts' reply brief that they could show a substantial and imminent endangerment for RCRA purposes simply by attributing PCB contamination to the demolition in excess of Wisconsin's residential cleanup standard. I don't think there will be any need for the court to reach this issue, both because the Leibarts' lack the necessary expert opinion evidence to show that the defendants deposited any amount of PCBs on their property, and also because even if they had that, they can't deal with the fact that defendants are already committed to cleaning up the discovered contamination anyway. But I still want to address it. Well, they alleged that you have violated your own cleanup plan. Is that right? The self-implementing plan? Yes. Yes. I believe you're referring to the burial allegations? Yes. Yes. And to be clear, thank you, I'll address the burial allegations. So the record is clear, defendants deny the burial allegations. Had we been forced to answer the file, because they waited four months, at least four months after discovering their claim, to move to amend the complaint, by which time we had already filed and fully briefed summary judgment motions and motions to exclude expert testimony. If that hadn't happened, and the Leibarts had been given leave to amend their complaint, we absolutely would have denied the allegation that any of the PCB impacted concrete was buried on the property. But it procedurally never came to that, because they weren't given leave to amend their complaint. And I don't wanna waste too much time on the issue, it's addressed in our briefs. We, of course, believe that particularly in light of the Leibarts delay, and when they filed their motion for leave to amend, that the district court's decision on that issue must be sustained. What's your plan for this property? The defendant's... Can I ask to clarify, do you mean the SVX property or the Leibarts property? The property that you own. Yes. I don't know, Your Honor, is the short answer, I'm sorry. So you don't know whether you're gonna keep it just there or sell it or anything else? I don't know, and I apologize. It just was never an issue that became relevant in the litigation. SVX's history goes all the way back in different corporate forms to the 1950s, is that correct? I don't know that that's correct. My understanding, Your Honor, is that SVX became the owner of the property in the 1990s. Was the transformer production, the stuff that was going on, things that were going on in the 50s and 60s and 70s, is that a predecessor company to the same company that's a party to this lawsuit? That is not my understanding, and as the district court noted, the Leibarts never claimed that defendants could be held somehow responsible for any contamination not attributable to the 2015 demolition. Which was in the spring of 15, correct? That's correct. Very briefly on the Wisconsin residential cleanup standard, the Leibarts cite no authority for the proposition that that standard can substitute for the RCRA substantial and imminent endangerment analysis. And cases cited in our brief, Simsbury Avon Preservation Club, pages 212 to 214 and City of Fresno v. United States, page 942, those cases warn against exactly that. They explain evidence of contamination in excess of government standards is not enough on its own to show a substantial and imminent endangerment under RCRA. I'd also direct the court's attention to docket 92-6, where a toxicologist for the Wisconsin DNR itself wrote to Mr. Leibart before this suit and explained that even though the contamination discovered in Leibart's property was higher than what the DNR wanted to see, it was not, in the DNR's view, high enough to make people, birds or pets sick from coming in contact with the soil. The Simsbury Avon Preservation Club case at page 211 explains that a substantial and imminent endangerment requires some reasonable prospect of future harm arising sometime in the near term and involving potentially serious harm. It's not enough just to show contamination above the state regulatory standard, even though the plaintiffs can't show that defendants cause that either. And the very last point I wanna make, Mr. Rosemann talked about the district court's exclusion of Carpenter. I'm not gonna spend a lot of time on that at all, but it just is not true that the district court excluded all of Carpenter based on the fact that he had the one unsupported opinion that the district court did exclude. This case is not like the Schultz case. In that case, the expert had two completely different opinions. One was supported, one was not. The unsupported opinion was a lot like Carpenter's. It was a no threshold of safe exposure opinion. The district court in Schultz erred by excluding both of those opinions. That's not what happened here. That's all I had to convey. I'm happy to take further questions if the court has them or take my seat. Thank you. Thank you, counsel. Thank you. Your Honor, I'd like to address several points raised by opposing counsel. Initially, this court has held in Gaten v. McCoy that experts do not have to rule out all alternative causes, especially in a case such as this where the cause is, quote, obvious. That case, as well as the Dillon case that we cited, also cited common sense. When a particular cause is obvious, especially in those cases, we don't need to be, an expert does not need to rule out every other potential causes. Opposing counsel mentioned evidence of imported soil. There is no such evidence of imported soil in the record. Mr. Splittack also referred to amusement park equipment. There is no evidence anywhere that amusement park equipment has PCBs or ever did have PCBs. Mr. Splittack also mentioned Ms. Margaret Carrillo's expert report, which in fact shows a photograph of the Leap Heart home in 1929, before Monsanto, who was the only manufacturer of PCBs, started manufacturing PCBs. The house was constructed before the SPX facility was there. There's a picture of it, as I said, in Ms. Margaret Carrillo's expert report. I think that it is imperative that the court bear in mind the may present standard. It is not necessary for plaintiffs to show actual injury and harm. Merely that a condition, a release of contaminants may present such harm. And it is inconceivable that having found PCBs in the soil of a residential backyard could not be considered to not present or may not present an imminent substantial endangerment, especially under these conditions. We're talking about residences. Additionally, I refer the court to, and I'm sorry I don't have the particular docket number, the memorandum of how the samples were taken. David McNichol instructed Nathan Braun, the person who is taking the samples, to remove the grass and roots before taking those samples. So it is very likely that the actual data would show PCBs in much higher concentrations than we see in tables 1 and 2, which are already in excess of the DNR standard. The may present standard is what is operable here, as well as preponderance of the evidence. Indeed, in, excuse me, I can't recall the case name, but there was a central district of Illinois case, whose name escapes me now, excuse me, that cited this court's opinion in PMC v. Sherman Williams as virtually a per se standard. Judge Posner stated in that case that there were contaminants resting above an aquifer and are called for remediation by anyone's standards. And the court said that's all that's needed for the may present standard. It's serious, the may present standard has been interpreted to mean something serious, something that needs to be cleaned up. It is inconceivable that PCBs may possibly not present an imminent substantial endangerment. Additionally, I assume my time is up here. Counselor, let me just ask you a question. Do you think that you could come with an agreement for a cleanup plan? Is it possible? Well, I believe that currently that cleanup plan would have to have include removal of the buried PCB waste. The court asked Mr. Splitheck what it planned to do with this property. Currently, it has left an unlawful PCB landfill in the midst of water tech. That's unthinkable in this day and age. Could we come up to a plan? Yes, we could, but it must require, as the federal regulations require, a complete investigation, a statistically based, the regulations require a statistically based sampling plan. Those are the exact words in the statute. It must, that is why these regulations are here, to prevent exactly the situation that we have before us. So yes, we could come to an agreement on the plan, but the regulations dictate what that plan has to be. There's no dispute that the DNR approved plan does not fit that requirement, Your Honor. Thank you, Counselor. Thanks to both counsel and the case will be taken under advisement. Thank you.